Matter of Joshua PP. v Danielle PP. (2022 NY Slip Op 03153)

Matter of Joshua PP. v Danielle PP.

2022 NY Slip Op 03153

Decided on May 12, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 12, 2022

528004 528458 528459 528460 528461
[*1]In the Matter of Joshua PP., Appellant,
v
Danielle PP., Respondent. (And Other Related Proceedings.)

Calendar Date:April 18, 2022

Before:Egan Jr., J.P., Colangelo, Ceresia and Fisher, JJ.

Matthew C. Hug, Albany, for appellant.
Michelle I. Rosien, Philmont, for respondent.
Tracey A. Brown, Delmar, attorney for the child.

Colangelo, J.
Appeals (1) from an order of the Family Court of Albany County (Kushner, J.), entered November 14, 2018, which, among other things, dismissed petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody and visitation; and (2) from four orders of said court, entered December 17, 2018, which dismissed petitioner's applications, in four proceedings pursuant to Family Ct Act article 6, to, among other things, hold respondent in willful violation of a prior order of custody and visitation.
Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the parents of the subject child (born in 2006). Pursuant to a November 2008 separation agreement executed by the parties, which was later incorporated but not merged into their December 2008 judgment of divorce, the parties shared legal and physical custody of the child with evenly split parenting time and two nonconsecutive weeks of vacation with the child in the summer. Among other provisions in the agreement, each party was prohibited from doing anything to estrange the other party from the child or hamper the natural development of love and affection between the other party and the child. The agreement also imposed an affirmative obligation on the parties to take all reasonable steps to foster a loving relationship between the child and the other party. The parties then agreed upon an informal schedule to implement their shared parenting time.
In July 2015, the father filed a violation petition, and the parties thereafter filed, among other petitions, cross petitions to modify the custodial agreement. Family Court conducted a fact-finding hearing over the course of 19 days, between February 2017 and September 2018, that resulted in an order dismissing the father's modification petition and granting the mother's modification petition by awarding her primary physical custody of the child and modifying joint legal custody to provide her with final decision-making authority upon impasse. Family Court also ordered the father and the child to participate in therapeutic counseling and ordered parenting time as recommended by the therapeutic counselor, both to be facilitated by the mother. The father's pending enforcement/violation petitions were dismissed as moot. The father appeals, and we affirm.
"A parent seeking to modify an existing custody order must first show that a change in circumstances has occurred since the entry of the existing custody order that then warrants an inquiry into what custodial arrangement is in the best interests of the child" (Matter of Andrea II. v Joseph HH., 203 AD3d 1356, 1357 [2022] [internal quotation marks and citations omitted]; accord Matter of Zachary C. v Janaye D., 199 AD3d 1267, 1267-1268 [2021]; see Matter of Derek KK. v Jennifer KK., 196 AD3d 765, 766 [2021]). Although Family Court failed to make an express finding relative to a change in circumstances, its decision is replete with [*2]findings that the parties cannot co-parent and that their diverse parenting styles made it impossible for them to agree on anything with respect to the child (see Matter of Paul Y. v Patricia Z., 190 AD3d 1038, 1041 [2021]). Moreover, "this Court's authority in custody cases is as broad as that of Family Court and, therefore, we may review the record and make an independent determination as to whether the requisite showing of a change in circumstances was made" (Matter of Andrea II. v Joseph HH., 203 AD3d at 1357 [internal quotation marks and citations omitted]). Having conducted such independent review, we find that the then-existing joint custody arrangement was no longer feasible, given the parties' inability to effectively communicate and/or unwillingness to work cooperatively with one another for the good of the child with respect to important medical, dental and psychological decisions (see Matter of Sabrina B. v Jeffrey B., 179 AD3d 1339, 1340 [2020]; Matter of Aimee T. v Ryan U., 173 AD3d 1377, 1378 [2019]). Thus, a change in circumstances from the date of the original order regarding the child is evident, allowing an inquiry to proceed into the child's best interests (see Matter of Paul Y. v Patricia Z., 190 AD3d at 1041).
"In making a best interests determination, Family Court must consider a variety of factors, including the quality of the parents' respective home environments, the need for stability in the child's life, each parent's willingness to promote a positive relationship between the child and the other parent and each parent's past performance, relative fitness and ability to provide for the child's intellectual and emotional development and overall well-being" (Matter of Andrea II. v Joseph HH., 203 AD3d at 1357-1358 [internal quotation marks, brackets and citations omitted]; see Matter of Paul Y. v Patricia Z., 190 AD3d at 1041). "Given that Family Court is in a superior position to evaluate the testimony and credibility of witnesses, we accord great deference to its factual findings and credibility assessments and will not disturb its determination if supported by a sound and substantial basis in the record" (Matter of Zachery VV. v Angela UU., 192 AD3d 1220, 1223 [2021] [citations omitted]; see Matter of Jamie UU. v Dametrius VV., 196 AD3d 759, 761 [2021]; Matter of Jessica HH. v Sean HH., 196 AD3d 750, 753 [2021]).
The shared custodial arrangement continued until the child was 10½ years old, at which time Family Court, in the early stages of the fact-finding hearing, and by orders dated May 3, 2017 and June 26, 2017, respectively, reduced the father's parenting time to three hours on his custodial days and reduced it further to three hours on Sundays only. At the conclusion of the hearing, Family Court found that both parents were able to assist with the child's intellectual development and were fairly equally suited on the issues of relative fitness, quality of their home environments and financial stability and [*3]ability to provide for the child. Its determination of the child's best interests then rested on the mother's ability to address the child's emotional development, by acknowledging the child's psychological issues and demonstrating an ability to cooperate with and follow the recommendations of the child's doctor and therapists, and the father's unwillingness to do so.
Maria Kuethe, the court-appointed forensic psychologist, conducted an evaluation of the parties and the child in January 2016, after the parties' modification petitions were filed but prior to the fact-finding hearing. She testified that she observed that the mother and the child shared many interests and had a wonderful time together but that the mother also reinforced the child's fears and encouraged his dependence on her. Although Kuethe described some of the mother's behaviors as devious and manipulative, such as promising the child events that conflicted with the father's parenting time, she found the father's belligerent responses equally or more damaging. She also described the father's rigidity in his actions with the mother to be "alarming" and some of his actions "appalling," such as when he called the police and demanded that the mother be arrested when the child locked himself in the bathroom because he wanted to go to a dance competition rather than spend time with the father. Kuethe further opined that "[t]his must have been terrifying to [the child], and [the father's conduct] shows no parenting skill, flexibility, or empathy on [his] part." Based upon her observations, Kuethe found that the father appears to direct all of his energies toward the goal of defending what he considers his parental rights rather than what the child is experiencing. Contrary to the father's claim, Kuethe testified that parental alienation was not occurring.
As to the parties' respective home environments, the record reflects that the child has no private time with the father and receives little attention or affection from him because the father remarried and now has two other biological children, as well as two stepsons who stay at his house 50% of the time. By contrast, the mother lives with the child's maternal grandmother and the child is the focus of their attention and affection. The father does not permit the child to bring his cell phone, iPad or computer to his house, but allows his stepsons, who are only slightly older than the child, to have and use their electronics when they visit. The father stopped calling the child at the mother's house to say goodnight and told the mother that she was not permitted to call his house, and the child is not allowed to call the mother without special permission. The child's lack of contact with the mother when at the father's house caused the child to feel upset, abandoned and desperate, and increased his anxiety. Further, the child was not permitted to bring any toys or games from the mother's house, except a soccer ball, on his [*4]visits with the father, nor was the child, who has been dancing since he was a toddler, permitted to practice his dance routines at the father's house. The father failed to understand, or at least acknowledge, how his treatment of the child, as well as the very real change in the child's life by virtue of now having to share his father with the father's new family, has negatively impacted the child.
With respect to the child's emotional health and overall well-being, the child has been diagnosed with obsessive compulsive disorder (hereinafter OCD) and anxiety, and the parties' responses to these diagnoses, recommended medication and counseling for the child underscored the difference in the parties' parenting styles and displayed the father's "bull-in-a-china-shop" posturing observed by Kuethe. The father's lack of empathy and refusal to acknowledge or demonstrate any interest in, or capacity to appropriately manage, the child's psychological issues are amply set forth in the record. Initially, the father resisted the mother's attempts to address these issues with the child's pediatrician in 2015 or to enroll the child in counseling. When medication was eventually prescribed by the child's pediatrician, and despite the pediatrician's explanations to the father, the father became confrontational, aggressive and loud in the pediatrician's office and refused to administer the medication to the child during his parenting time. The child was thereafter discharged as a patient from the pediatric office. In May 2016, the child, then nine years old, was scheduled to undergo dental work. According to the mother, the father ignored the child's expressed anxiety and objected to her presence in the procedure room stating, "he needs to be a man. The other boys do this. He needs to stop. He does not need his mom in the room." The father caused a disturbance in the dentist's office to the point where the dental procedure could not be completed in the allotted time, which required the child to return a second day. The child was then discharged as a patient from the dental practice.
The child suffered the same fate with his therapist. The father not only denied that the child suffered from any psychological issues, he also told the child that his psychological issues did not exist. As a result, due to the father's failure to follow the therapist's recommendations — despite his agreement to do so in court — and because his behavior continued to increase the child's anxiety and thwart the child's therapeutic process, the child was discharged from his therapist's office in July 2017. Such discharge caused the child great upset.
According to the father, the child does not exhibit symptoms of OCD or anxiety in his house and he is able to minimize any symptoms he sees. According to the child's therapist, the father noticed and then raised the issue of the child's facial tics but refused to acknowledge the underlying diagnosis and maintained that these [*5]behaviors were both greatly exaggerated by the mother and encouraged solely to interfere with the father's family and his parenting time with the child.
The record also establishes that the child's primary activity and passion is dance. He has grown up in the dance studio owned by his mother, has taken numerous classes each week, has participated in recitals since age two or three and, more recently, has competed on a regional and national level. According to the mother, the father cooperated with the child's involvement with dance until the child was seven years old. Since then, the father has not wanted the child to participate in dance on his parenting days and has even withheld the child on the mother's parenting days to prevent him from attending dance classes. The father's behavior has negatively impacted the child's ability to compete with the same group of boys with whom he has competed for five years.
By way of example, the mother had agreed to a temporary change in the parenting schedule to accommodate the father's summer work schedule. Under the original schedule, the child was with the father from Wednesday through Friday at 5:00 p.m. on alternate weeks. The mother acceded to the father's request that the child sleep at his home from Wednesday through Friday. However, when the mother refused to make this schedule permanent and, in addition, refused to allow the child to stay at the father's house on Friday nights, the father withheld the child through Saturday mornings until the dance classes ended. By this behavior, the father intentionally deprived the child of attending Saturday classes during the mother's parenting time. Notwithstanding the opinions of the child's therapist and the forensic psychologist that dance is a source of pride for the child and that it would be harmful to the child if he were denied the ability to dance, the father refused to allow the child to participate in dance classes on his time, even when the mother offered to transport the child both ways, because it interfered with the child's participation in family time with his family, including his stepmother, half siblings and stepsiblings. The testimony further established that the father, on occasions where he had attended the child's competitions, engaged in altercations with staff and behaved inappropriately.
As to other activities, the testimony established that the child was not allowed to join school clubs unless all of the meetings or activities fell on the mother's parenting days. The father did sign the child up for basketball for the 2015-2016 season, because one of his other children played, but he refused to give the mother the child's practice schedule so she could be present. The father also objected to the mother's presence on the child's first day of second grade because it fell on the father's parenting day. The father further made it clear to the child's teacher that he does not want the mother to come in as a classroom helper [*6]in the child's classroom on his parenting day. Finally, in April 2017, following the child's tonsillectomy, the father refused the child's request to recuperate at the mother's house, accusing the mother of manipulating the child. The child's therapist opined that the father's insistence in exercising his parenting time over the child's wishes caused an increase in the child's anxiety for which Prozac was prescribed.
With respect to the remaining factors, the mother has cooperated and followed the recommendations of the child's doctors and therapists. The father, however, has alienated the child's pediatrician, dentist and therapist and caused them to discharge the child from their practices, thereby disrupting the continuity of the child's care. Additionally, although the father has consistently denied that the child suffers from OCD and anxiety, the child's therapist testified that the child's OCD and anxiety are real and that the child's irrational reactions towards the father are triggered by the father and are symptomatic of such conditions. Like Kuethe, the child's therapist did not detect alienating behavior on the part of the mother, but she nonetheless was of the opinion that the parties were unable to work together to help the child overcome his fears and would be unable to make joint decisions. As Family Court concluded, the "father's attitude towards the mother is so negative that [it] is unable to find that he promotes the child's relationship with her," in contrast to the mother's "better ability to promote contact between [the child] and his father." Family Court also properly took into account the child's expressed wishes, which, although not determinative, "are some indication of what is in [the child's] best interests, considering the [child's] age, maturity and potential to be influenced" (Matter of Angela H. v St. Lawrence County Dept. of Social Servs., 180 AD3d 1143, 1146 [2020] [internal quotation marks and citations omitted]; see Eschbach v Eschbach, 56 NY2d 167, 173 [1982]). According deference to Family Court's credibility and factual determinations, and after reviewing the record before us, we are satisfied that the modification of the custodial arrangement to award primary physical custody of the child to the mother is supported by a sound and substantial basis in the record (see Matter of Zachery VV. v Angela UU., 192 AD3d at 1223). Family Court also prudently recognized that a structured visitation schedule would not be in the child's best interests and would likely cause further conflict. In this regard, the record established that, after the father's parenting time with the child was reduced to a period of three hours on Sunday away from his home to allow for quality parenting time, the father elected to forgo seeing the child for several months because he wanted to be with "his family." "Instead, the court thoughtfully provided for a course of preparational therapy . . . in order to explore a path toward [*7]a meaningful relationship between [the father and the child]" (Matter of Timothy D. v Becki C., 195 AD3d 1081, 1082 [2021] [citation omitted]). In our view, Family Court's determination has a sound and substantial basis in the record (see id. at 1083).
As to the father's contention that Family Court erred in dismissing four violation/enforcement petitions that he filed, he did not raise any argument with respect to the December 17, 2018 orders dismissing said petitions. Accordingly, the father's challenge to such orders is deemed abandoned (see Matter of Paul Y. v Patricia Z., 190 AD3d at 1040 n 2). The father's remaining arguments have been considered and are unavailing.
Egan Jr., J.P., Ceresia and Fisher, JJ., concur.
ORDERED that the orders are affirmed, without costs.